HON. RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NAAMAN SHEPARD,

    Plaintiff,

v.

FOREMOST INSURANCE COMPANY, INC.,

    Defendant.

No. C08-434 RAJ

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## I. FINDINGS OF FACT

1    Plaintiff purchased his boat, a 1993 Four Winns 245 Vista cabin cruiser, in a used condition, in 1993. At the time of purchase, the vessel had 50 engine hours of use.

2.    At no time during the lifetime of this boat, did Plaintiff, himself, perform any maintenance or inspection of any kind to any part of the engine, including but not limited to the exhaust system. From 1993 to 1998, the only work to the boat was annual winterization performed by the boat dealer who originally sold the boat to the first owner. There is no evidence that at any point during that time, the manifolds, elbows/risers, or any other part of the exhaust system was ever inspected, replaced or in any way maintained.

ORDER – 1

3. Beginning in 1998, Plaintiff stopped using the dealer for winterization and began using Mr. Bob Gierke. Plaintiff found Mr. Gierke in the telephone book. Mr. Gierke operates his own mobile marine service. According to his invoices, Mr. Gierke performed winterization of the boat on the following dates: May 12, 1998; November 2, 1999; November 30, 2000; November 13, 2001; November 7, 2002; November 7, 2003; October 7, 2004; and December 8, 2005.

4. The only other work performed by Mr. Gierke was on July 29, 2002, when he replaced an exhaust boot and repaired a stiff shifter. Mr. Gierke has testified that he has no idea why the exhaust boot was replaced. He testified that Plaintiff instructed him to replace the boot.

5. No other maintenance of any kind was performed by Mr. Gierke or anyone else from 1998 until the date of this loss.

6. The manifolds, risers/elbows, water pump and all other parts of the exhaust system (other than the exhaust boot mentioned above), were original manufactured parts. All of these parts were approximately 14 years old at the time of this loss.

7. According to the service manual applicable to this boat, the exhaust manifolds and elbows/risers were to be checked once per season. According to Mr. McLaughlin, the manifolds and elbows/risers needed to be taken apart and inspected every 2-3 years, in a boat such as this that ran in saltwater. They should have been replaced every 4-6 years. There is no evidence the manifolds, risers, or elbows had been inspected since the date of manufacture, based on the fact that all of the fasteners were still coated with original paint. According to David Cater, Plaintiff's own expert, these manifolds and elbows/risers needed to have been inspected and replaced within 8-10 years from the original manufacture of the boat. Mr. Cater testified that he would have recommended replacement of the manifolds and elbows/risers in approximately 2001 -

ORDER – 2

2003. Mr. Gierke also testified that he would have recommended replacement of these parts prior to this loss.

8. The manifolds and elbows/risers were beyond their useful lives as of the date of this loss.

9. The manifolds and elbows/risers, as well as the remaining sections of the exhaust coolant system were not properly maintained.

10. During his ownership of this boat, Plaintiff regularly took the boat into saltwater. He would attempt to flush the exhaust system by either taking the boat through fresh water before returning it to his house, or by hooking up a flushing attachment, which he used on his boat for only approximately 5 minutes after he returned the boat to his home. According to Mr. McLaughlin, proper flushing on this boat, using a flushing attachment, would require running the engine for a minimum of 25-30 minutes to reach full operating temperature.

11. Regardless, even if the boat had been flushed properly, there is no question that it should have been inspected and replaced prior to this loss.

12. Plaintiff also admitted that prior to every trip he ever took in his boat, he would open the engine hatch and inspect the belts, check the oil, and otherwise inspect the engine to make sure it was in proper condition to run. Of the witnesses who testified at trial that they had been on this boat, everyone agreed that the engine and exhaust system could be readily viewed by opening the engine hatch.

13. The seawater intake pump (water pump) was also original factory equipment on this boat. It also had not been inspected or in any way maintained during the 14 year life of this boat prior to this loss. According to Mr. Cater, the water pump should have been replaced every 4-5 years. The age of this water pump was approximately triple its proper and useful life.

ORDER – 3

14. At no time did Plaintiff request that Mr. Gierke perform any inspection of the boat's engine or exhaust cooling system. Mr. Gierke was not asked by the insured, and thus did not, provide any other recommendations regarding additional work or maintenance to be done to the boat. Mr. Gierke was never asked by Plaintiff to provide an opinion or guidance as to whether any additional maintenance or inspection was ever necessary. In addition, there is no evidence that Plaintiff followed any manufacturer-recommended maintenance or service manuals for the proper care and maintenance of his boat.

15. Plaintiff's boat was insured under a Family Boater's Insurance Policy issued by Foremost. The policy provided, in part, as follows:

> **SECTION I – EXCLUSIONS**
> ...
> We do not insure loss caused directly or indirectly by any of the following excluded events. Loss will be considered to have been caused by an excluded event if that event:
>
> **a.** Directly and solely results in loss; or
>
> **b.** Initiates a sequence of events that results in loss, regardless of the nature of any intermediate or final event in that sequence.
>
> > **8.** Lack of reasonable care or due diligence in the maintenance of **your watercraft**, trailer or personal property.
> >
> > ...
> >
> > **12.** Wear and tear, dampness of atmosphere, gradual deterioration, rust, corrosion, electrolytic or galvanic action, marring, chipping, scratching, or denting.

16. Plaintiff admitted that he received and reviewed his policy of insurance,

ORDER – 4

including the above exclusions, prior to this loss. He admitted that he understood that if he had a loss that was caused by lack of maintenance to the boat, it would not be covered.

17. Plaintiff admitted that he never had any conversations with his agent or anyone else from Foremost prior to this loss regarding any specific coverages provided by the policy, or any of the policy exclusions. Plaintiff also admitted that his agent never provided him any false or misleading statements regarding his coverage or his exclusions. Plaintiff was never advised by his agent or anyone else at Foremost that his boat would be covered, no matter what the cause, if seawater were allowed to get into the boat.

18. On August 7, 2007, Plaintiff placed his boat in Lake Union, in Seattle, Washington. The boat was left in the water that night. The next morning, Plaintiff and his sister took the boat from Lake Washington into Puget Sound and north toward the San Juan Islands. They traveled in the boat for approximately 4-5 hours. During that time, Plaintiff was looking out for debris floating in the water. As a result, he was driving slower than is typical for this boat. He was driving approximately 22-25 miles per hour. Plaintiff did not notice any problems starting the engine that day and the boat appeared to be running without any warning of problems to come. There was no sign of overheating in the exhaust system during this trip or evidence of an actual encounter with floating debris of any type.

19. However, early that afternoon, while out in the open water of Puget Sound at cruising speed, Plaintiff heard a loud noise. He then saw steam coming from the vents in the engine compartment. Plaintiff opened the engine hatch and saw that water was coming into the boat. He and his sister then loaded themselves into his dinghy. A few minutes later, the Coast Guard arrived and pumped the water from Plaintiff's boat and towed it to a nearby marina. While there, the boat was removed from the water so that it could be inspected. Certain interior components, as well as the engine and electrical

ORDER – 5

systems, were damaged by the seawater. It is the damage which is being claimed by Plaintiff.

20. Thereafter, Plaintiff contacted Foremost and submitted a claim for this loss.

21. A marine surveyor, Mr. Larry Montgomery, was retained by Foremost to inspect the boat and provide an opinion as to, among other things, the cause of the loss. Mr. Montgomery, President of Montgomery Maritime Survey, Inc., conducted multiple inspections of the boat, as well as removal and inspection of specific parts from the engine which were involved in causing this loss. Mr. Montgomery also worked hand-in-hand with an expert marine mechanic, Mr. Loren McLaughlin, who agreed with Mr. Montgomery's ultimate conclusions.

22. This loss was the result of long term build up of rust and corrosion inside the starboard elbow/riser. The build up of rust scale within the manifold and elbow/riser prevented sea water (which is used to cool the engine and exhaust) from flowing properly and resulted in an increase of temperature which eventually became extreme enough to cause a rupture in one of the rubber boots, which allowed water into the boat, causing the damage claimed by Plaintiff.

23. The build up of rust was due to lack of proper maintenance and due diligence in the care of the boat. The manifold and elbow/riser were not properly maintained or cared for. As a direct result, the manifold and elbow/riser eventually became blocked by the long term build up of rust. This is clearly demonstrated in Defendant's exhibits Nos. 140-147.

24. The efficient proximate cause of this loss was lack of reasonable and proper maintenance as well as the gradual build up of rust scale which lead to the failure of the exhaust cooling system to function properly and the rubber exhaust boot to rupture and allow water into the boat.

ORDER – 6

25. The loss was not caused by an external blockage outside the boat which prevented seawater from coming in through the intakes. Had this been the cause, there would have been evidence of double-sided failure and heat damage to the port side of the exhaust system, not just the starboard side. However, in this case, the only evidence of heat damage is damage on the starboard side of the exhaust system, downstream of where the blockage actually occurred, namely, in the starboard manifold and elbow/riser. Absent the presence of any objective evidence of blockage, Plaintiff's expert's opinion that clothing, debris, plastic or kelp caused the blockage is premised upon pure speculation.

26. The evidence also established that although the port and starboard manifolds and elbows/risers were the same age, there was significantly more rust scale build up on the starboard side than the port. The Court notes also that despite the requests of Foremost's experts during litigation, it was Plaintiff's expert who refused to allow any of the parties to take apart the port manifold and elbow/riser. This inspection would have provided direct visual evidence of the level of rust build up in the port side of the exhaust system.

27. The testing done by Mr. Montgomery and Mr. McLaughlin verified that the subject thermostat housing is not designed or manufactured in such a manner as to allow more water to flow to the port side exhaust system compared to the starboard side. In this regard, Mr. Cater's opinion on this issue was proven to be without merit.

28. The testing done by Mr. Montgomery and Mr. McLaughlin also confirmed that the subject impeller was still able to push sufficient water through the boat's exhaust coolant system to comply with the manufacturer's specifications. This establishes that the impeller could have been functioning properly on the date of loss, despite receiving previous heat damage. This heat damage could have occurred at any point during the 14 year life of the water pump. This testing established that Mr. Cater's theory that this loss

ORDER – 7

must have been the result of external blockage is without merit. Mr. Cater's theory was based upon his belief that the water pump damage must also have been from this loss because it would not have functioned after receiving the damage found here. Mr. McLaughlin's testimony regarding other evidence indicating the damage was pre-existing damage, disproved Mr. Cater's hypothesis.

29. The evidence of heat damage to the starboard elbow/riser also establishes that there was still some water getting through the manifold and elbow/riser on that side when this loss occurred. This establishes that there was no complete exterior blockage event such as running over a plastic bag.

30. Because some water was still able to run through the starboard exhaust system, and because the port side likely had an even greater flow of water (as evidenced by the lack of heat damage to that side) there would have been no warning whatsoever to Plaintiff of the impending rupture of the starboard bellows. Sufficient water was able to flow out of the engine to keep the temperature gauge from moving in any significant manner. Because this was not a double-sided failure of the exhaust coolant system, there was no warning to Plaintiff of what was to eventually occur on the date of loss.

31. The boat had been in the water for over 24 hours prior to this loss and had been running for approximately 4-5 hours when the loss occurred. This means that this was not an instance of damage caused by blockage of the water pump's vent hose.

32. There was no evidence of dislodged rust "flakes" in the outlet of the elbow/riser. Moreover, the only rust flake evidence found in this case was in the manifold crutch tip, which is exactly where such flakes are meant to be deposited - where they cannot cause any blockage problems. This establishes that it was the gradual build up of rust and corrosion which caused this loss. This was not an instance in which some external blockage event caused rust flakes to dislodge and then block seawater coolant flow.

ORDER – 8

33. The gradual build up of rust within the manifold and elbow/riser is a widely understood and recognized condition. The dangers of rust build up are well documented and understood in the marine community. This is precisely why manufacturers require regular inspections of these engine parts. The issue of excessive rust build up is related solely to a lack of proper maintenance. As long as a boat is properly maintained, rust build up in the manifold and elbow/riser should never pose a problem and should not cause any damage to the boat.

34. The issue of rust build up and corrosion in the manifolds and elbows/risers is not a defect or flaw in design or manufacture.

35. Plaintiff's boat, including all components of the exhaust coolant system, met all manufacturer and industry standards. The boat did not possess any defects in manufacture or design. This design, including the use of rubber components below the water line is very common, safe and compliant with all government and industry standards.

36. If this boat had been maintained properly and rust had not formed in the starboard manifold and elbow/riser, this loss would not have occurred. The loss was not the result of any manufacturing or design defect with respect to the location of the ruptured rubber bellows.

## II. CONCLUSIONS OF LAW

1. Plaintiff is a citizen of Washington.

2. Foremost is incorporated under the laws of the state of Michigan.

3. This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which was properly removed to this Court by Foremost pursuant to 28 U.S.C. § 1441(b) and § 1446 in that it is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4. Washington law governs all matters of policy interpretation, construction, and application to the facts of this case. *See Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 509-10 (9th Cir. 1984) (holding that state law controls the interpretation of a marine insurance policy "in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice"). Neither party has shown that, due to a federal statute, judicially fashioned admiralty rule, or a need for uniformity in admiralty practice, the court should apply admiralty law instead of state law.

5. Under Washington law, it is the obligation of this Court to enforce the terms and conditions of the policy as written. An insurance contract is no different from any other contract. *Findlay v. United Pacific Ins.*, 129 Wn. 2d 368 (1996). Moreover, the Washington courts have held that a court should construe the policy to give full force and effect as to all provisions of the policy. *McDonald v. State Farm,* 119 Wn.2d 724, 734 (1992).

6. The Washington Supreme Court has consistently ruled that where the policy language is clear and unambiguous, it must be enforced as written. *Washington Public Util. Dist. Util System v. Public Util. Dist. 1*, 112 Wn.2d 1 (1989), *Greer v. Northwestern National Ins.,* 109 Wn.2d 191 (1987); *see also*, *Wolf Bros. Oil Co. Inc., v. International Surplus Lines Ins. Co.,* 718 F.Supp. 839 (W.D. Wash. 1989). Moreover, if the language of the policy is clear and unambiguous, the court may not modify the contract or create an ambiguity where none exists. *Id; See also Transcontinental Ins. v. Utility System,* 111 Wn.2d 452 (1988). The Supreme Court of Washington has recently provided the following advisement in this regard:

> An insurance policy is construed as a whole, with the policy being given a 'fair, reasonable, and sensible construction as would be given to the contract by an average person purchasing insurance.' If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create an ambiguity where none exists.

ORDER – 10

*Panorama Village v. Allstate Ins. Co.,* 144 Wn.2d 130 (2001) (*citing Weyerhaeuser Co. v. Commercial Union Ins. Co.,* 142 Wn.2d 654 (2000)).

7. A court may deviate from this general rule only if the policy language is determined to be ambiguous or if there are conflicting terms in the policy. However, not all language is ambiguous. An ambiguity exists only if the term or provision is reasonably susceptible to two or more meanings. *American Nat'l Fire Ins. v. B&L Trucking*, 134 Wn.2d 413 (1998). Simply because the policy is confusing or difficult to read does not render the policy language ambiguous. *McDonald*, 119 Wn.2d at 734. Additionally, simply because a term is not defined does not make the term ambiguous. It is black letter law in Washington that undefined terms in an insurance policy should be construed by reference to the term's plain and ordinary meaning. The Washington Courts have repeatedly held that the plain, ordinary meaning which is provided in a standard English dictionary is sufficient. *Queen City Farms*, *supra*; *Boeing v. Aetna Casualty & Surety Co.*, 113 Wn.2d 869 (1990).

8. The policy provisions at issue in this case are not ambiguous. Plaintiff has not set forth any evidence that any provision is reasonably susceptible to two different interpretations. Plaintiff's own expert, Mr. Christo, agreed that the policy was unambiguous. As a result, this Court must enforce all of the policy provisions. To this end, the policy exclusions cited above must be enforced and the exclusions given full force and effect. Plaintiff has provided the Court with no authority and no evidence that the above cited exclusions should not be enforced as written.

9. Washington follows the efficient proximate cause rule in analyzing coverage. Under this rule, the court looks to the predominant cause of the loss in order to determine coverage. See *Graham v. Pemco*, 98 Wn.2d 533, 538 (1983); *Safeco Ins. Co. v. Hirschmann*, 112 Wn.2d 621, 625 (1989); *Eide v. State Farm Fire and Cas. Co.*, 79

ORDER – 11

Wn. App. 346, 349 (1996). The Washington Supreme Court has ruled that in assessing coverage, a cause is considered the proximate cause of a loss if that peril sets other causes in motion which, in an unbroken sequence of events, results in the final loss. As set forth in *Graham*:

> It is the efficient or predominant cause which sets into motion the chain of events producing the loss which is regarded as the proximate cause, not necessarily the last act in a chain of events.

98 Wn.2d at 538.

10. The efficient proximate cause of all damage claimed by Plaintiff is lack of reasonable care in the maintenance of the boat as well as the build up or rust. Both of these causes of loss are specifically excluded under the terms and conditions of the policy of insurance. There is no coverage for Plaintiff's claim under the terms of the subject policy.

11. This loss deals with a single incident in which damage was caused by one unbroken sequence of events. As a result, there is no ensuing loss or resulting loss at issue in this case. Any and all water damage claimed is the proximate result of the lack of maintenance and rust build up.

12. Mr. Draper's testimony that the water damage should be treated as a separate event from the rupture of the bellows which allowed the water in, is in direct contradiction to Washington law and the efficient proximate cause rule. Plaintiff is not allowed to assess coverage for the water damage by looking only at the water getting in. A proper analysis under the efficient proximate cause rule is to determine what event caused the water to get in - the initiating event in the chain of causation. As long as we are dealing with one chain of causation, as we are here, all damages which flow from an excluded peril are excluded.

ORDER – 12

13. Mr. Draper and Plaintiff's proposed method of determining causation would have the effect of nullifying any and all exclusions within this marine policy. According to their theory, if the boat sinks or water gets in the boat, it is completely irrelevant what caused that water to get in. This would render all policy exclusions meaningless. This is not allowed under Washington law.

14. Because the maintenance exclusion does not make any reference to who is at fault for the improper maintenance, it is not relevant whether or not Plaintiff was negligent in his conduct in supposedly relying upon Mr. Gierke.

15. Because the exhaust system was in plain sight on the boat and was seen regularly by Plaintiff, it is not hidden. Thus the latent defect exclusion has no relevance to this matter.

16. Moreover, because there were no manufacturing or design defects on this boat which were the proximate cause of this loss, the latent defect exclusion does not apply.

17. Because the maintenance exclusion and the rust exclusion do not have ensuing or resulting loss provisions, any discussion of ensuing loss is not relevant and has no bearing in this case.

18. Even if the latent defect exclusion did apply, because the efficient proximate cause of the entire loss was an excluded peril, there is no ensuing damage in this case. Plaintiff is not allowed to seek coverage for an otherwise excluded loss using the ensuing loss provision. *Wright v. Safeco Ins. Co. of Am.*, 124 Wn. App. 263 (2004); *McDonald*, 119 Wn.2d at 734-35.

ORDER – 13

19. Because there is no coverage for the loss claimed by Plaintiff, he is not entitled to any recovery in this suit.

DATED this 11th day of March, 2009.

_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 14